Jose Angel CAVAZOS, Appellant,

v.

The STATE of Texas, Appellee.

No. 40897.

Court of Criminal Appeals of Texas.

Jan. 10, 1968.

Rehearing Denied Feb. 21, 1968.

Garcia & Warburton, by O. B. Garcia, Brownsville, for appellant.

F. T. Graham, Dist. Atty., A. G. Betancourt, Asst. Dist. Atty., Brownsville, and Leon B. Douglas, State's Atty., Austin, for the State.

## OPINION

BELCHER, Judge.

The conviction is for murder; the punishment, twenty-five years.

Appellant's first ground for reversal in his brief is that the trial court erred in permitting Dr. Delavega, who performed the autopsy, to testify to the position of the deceased and the appellant at the time of the killing. The ground being that it invades the province of the jury.

Dr. Delavega, a pathologist, testified that in performing an autopsy upon the body of the deceased, he found four gunshot wounds: That one entered the right temple at the hairline passing downward through the head, and lodging in the left side of the neck; and he expressed the opinion that

from the "small marks, black-like dots, black dots" around the entrance wound in the right temple that it was a close-up type wound; (2) that he found another bullet wound in the back of the left shoulder, the bullet travelling down, and toward the right through the aorta and chest lodging in the right side under the arm; (3) that another bullet entered the right side going horizontally through the liver, the diaphragm, and lodging in the left side; and (4) that the other bullet entered the chest, perforated the heart going downward, and was found in the stomach.

Dr. Delavega expressed the opinion that the deceased was most likely standing or lying on the floor when the bullet entered the right side and lodged in the left side; that the deceased could have been bending down or stooping over when the bullet penetrating the heart entered the body; that it was possible for the deceased to have been lying on the floor when the bullet entered the right temple; and that it was possible that the deceased was shot from behind because the bullet entrance was in the back.

Dr. Delavega further expressed the opinion that three of the bullet wounds were fatal; and it was stipulated that they caused the death of the deceased.

On cross-examination, Dr. Delavega testified in part as follows:

"Q Yes, but suppose the deceased, at the time that the wound which you have described as entering on the right side of the temple near the hairline and having been extracted from the soft tissue near the left jaw or neck—suppose that the person on whom that wound was inflicted was going on all fours toward a person who was on the ground, too, shooting at him, wouldn't that also be a possible position at the time of the infliction?

"A You mean the deceased going—

"Q Yes, walking on all fours toward the person who shot him, and that the person shot him and the bullet went in

there (indicating) and came out here (indicating). Couldn't that have been just as possible as the other way?

"A Yes.

"Q That is right. And also, as to those others that occurred on the right side that were taken out of the subcutaneous tissue on the left side—

"A Yes.

"Q —could have happened also while the body might have been in that position, the body of the deceased, shot at from another angle; isn't that correct? In other words, what I'm getting at, it could have been three or four or five positions in which the body of the deceased and the body of the person who shot him could have been that would have produced the types of wounds that—the trajectory of the wounds which you have described; isn't that correct?

"A You have to take the two points.

"Q Yes, but those two points—

"A The entrance and the end.

"Q That is correct. But that does not mean that he was shot from top to below; it could have been if he was in this position (indicating), the shot could have gone in here (indicating) and came out here (indicating), couldn't it?

"A Yes."

4 Branch (2) 339, Sec. 2027, in part reads:

"A physician who did not see the transaction is not entitled to attempt to reproduce it before the jury by stating his opinion as to the position of the parties and the manner in which he thinks the injuries were received."

The appellant testified that on going toward the nickelodeon in the tavern he first saw the deceased standing nearby and the deceased said, "What happened?" as he (deceased) made movements like taking a

pistol out of his pocket and he shot him; that they began grappling and the deceased kicked him and threw him to the floor; that the deceased on his "all-fours" started toward him and he shot him, but does not know how many times; that after he shot the deceased, the deceased grabbed his hand while with the other hand he was trying to pull something from his pocket and he shot the deceased again; then as he left the tavern he met Officer Lima who asked, "What happened?" and he told him that, "I got La Cuerda. He was going to get me," and gave Lima his pistol. The appellant further testified that he did not know which one of the shots hit the deceased in the head, in the chest, or in the back of the shoulder.

The testimony shows that the .32 caliber pistol which the appellant gave Officer Lima contained six spent shells.

■ While testifying, the appellant admitted shooting the deceased several times with a pistol. The detailed testimony of the pathologist showing the point of entry of the four bullets into the body and the trajectory of the bullets was admitted without objection, and to this testimony there appears no dispute. The testimony of the pathologist was uncertain as to any fixed and definite position of the body at the time either of the four wounds were inflicted. In view of the record, we conclude that the admission of the testimony complained of is not such error as to call for a reversal.

The refusal to grant a new trial is urged as error on the alleged grounds of jury misconduct.

The motion for new trial alleged that during their deliberations the jury sent a note to the court reading as follows: "If we set a maximum of years to serve can we set a minimum to serve," which clearly indicates that they discussed the time appellant actually would serve if a certain punishment was assessed, and also discussed the applicability of the parole law. ·

To support the motion, he attaches the affidavit of one of his attorneys which states

that he mailed each juror a letter asking if the jury discussed the time the appellant would serve if assessed certain punishment, and if he would sign an affidavit to that effect; that only one juror contacted the attorney but he refused to sign an affidavit for the reason he did not know who began such discussion.

At the hearing on the motion, six jurors including the foreman testified.

■ From their testimony it appears that the note was sent to the court to clarify some question that arose about the maximum and the minimum punishment set out in the charge for murder with and without malice, and whether they were to fix both. Also, the time he would have to serve on certain punishment assessed was discussed, but the foreman cautioned that this was not a matter for them to consider, and they were referred to that portion of the court's charge so instructing them. No juror purported to know or state the law applicable to the time to be actually served when certain punishment was assessed.

The trial court did not abuse its discretion in refusing to grant the motion for new trial on the above grounds.

Error is urged on the ground that the trial court erred in overruling appellant's objection to the state's argument to the jury that Irma Gomez was the only witness with guts enough to testify to exactly what she saw.

The argument, the objection thereto, and the action of the court thereon were as follows:

"(By State's Counsel) Then the next witness that the State used, of course, was Irma Gomez. And, gentlemen, let me say this right now: In this particular case, I think all of us,—I'm talking about the men here—ought to take our hats off to Irma Gomez. She is the only witness who came into this courtroom and told you exactly what she saw.

"Now, we had one, two, three, four, five other witnesses that came into this

courtroom and testified, all of whom were present when this happened, and she's the only one that had guts enough to come in here and testify to exactly what she saw.

"Appellant's Counsel: I'm going to object to that interpretation, Your Honor. There's nothing been shown that any of the other witnesses lacked guts to come in here. They were sworn and testified.

"The Court: All right, now, I'm going to instruct the jury to make their own observations and their own recollection with respect to that objection, but the objection, as such, would be overruled.

"Appellant's Counsel: Note our exception."

The witness Gomez, an employee of the tavern in which the killing occurred, testified that she saw the appellant shoot and continue to shoot the deceased with a pistol until it started clicking when "nothing else would come out," and then the appellant walked out of the tavern.

In appellant's brief he states that: "Raul Vargas, Federico Garcia, Jesus H. Gracia, Jorge Garcia Vasquez and Eusebio Rodriguez, all offered by the State, failed to state how the killing occurred." These witnesses were present when the shooting began.

The interpretation and final resolve of the testimony being with the jury, the argument complained of in light of the objection, the court's instruction, and all of the testimony of the witness Gomez and that of the other five witnesses does not, under the record, reveal any reversible error.

The refusal of appellant's requested charge on his right to arm himself is urged as a ground of error.

In refusing the requested charge, the court noted that it was covered in the main charge.

There appears no material difference between the requested charge and that given in the court's main charge. The refusal was not error.

It is pointed out that the court, in submitting self-defense, charged on real, apparent and threatened danger as it reasonably appeared to the appellant from his standpoint; and the court also charged on his right to continue to shoot.

The court's charge placed no limitation upon appellant's right of self-defense. Unless the court's main charge places a limitation upon the accused's right of self-defense, a charge as to the right of the accused to carry arms is not required. 4 Branch (2) 453, Sec. 2129; Pierson v. State, 160 Tex.Cr.R. 567, 272 S.W.2d 901.

The judgment is affirmed.